Filed 10/1/24  P. v. O'Connor CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B336404 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA104900) |
| v. | |
| MARY JEAN O'CONNOR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Suzette Clover, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2011, a juvenile court terminated Mary Jean O'Connor's parental rights to her child, E. Seven years later, O'Connor posed as a worker from the Los Angeles County Department of Children and Family Services (DCFS) to get the home address of 75-year-old Jeri Douglas, one of E.'s former foster parents. O'Connor then went to that home and killed Douglas. During O'Connor's criminal trial, the defense asserted Douglas provoked O'Connor's actions. However, O'Connor did not testify, and there was no evidence that Douglas said or did anything to cause O'Connor to act in the heat of passion. The jury convicted O'Connor of first degree willful, deliberate, and premeditated murder. (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a).)

O'Connor argues we should reverse her conviction because the trial court prejudicially erred in not instructing the jury on the lesser included offense of voluntary manslaughter based on provocation or heat of passion. She contends that even if the trial court did not so err, there was insufficient evidence to support the jury's finding of premeditation and deliberation. She lastly argues that her counsel rendered ineffective assistance in not requesting the pinpoint instruction for provocation, which could have reduced her conviction to murder in the second degree.

We find no error and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.    The Prosecution's Trial Evidence**

In April 2010, as part of dependency proceedings, Douglas fostered O'Connor's son, E.; Douglas later also fostered M.,

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

2

another of O'Connor's children. Between April and August 2010, O'Connor had supervised visits with E. three days a week. Douglas commonly attended those visits.

As is common in dependency proceedings, Douglas's daughter, Tanya J., and son-in-law, Bradley J., started the process to adopt E. in the event that O'Connor's parental rights were later terminated, and E. moved into their home in October 2010. Beginning in August 2010 and continuing until early 2012, local newspapers published articles that criticized Tanya and Bradley's adoption efforts. The articles used confidential information regarding the dependency proceedings that came from O'Connor and falsely stated that O'Connor's relatives had been prevented from adopting E. The dependency court admonished O'Connor for providing confidential information to the press.

Prior to a scheduled visit between O'Connor and M. in 2011, Douglas telephoned Tanya. Tanya described Douglas as sounding "nervous." Tanya spoke with Douglas after the visit and observed that Douglas was crying and her voice was shaking. Douglas said she was scared. Tanya understood from their conversation that O'Connor became so agitated during the visit, either kicking or punching a door, that a security guard intervened and the social worker directed Douglas to take M. and leave immediately. Although Douglas lived two miles from where the visit took place, she took a circuitous, 35-minute route home because she was fearful O'Connor might follow her.

Around May 2011, Tanya, Bradley, and Douglas began a relationship with O'Connor's parents and uncles, who lived in Chicago. O'Connor's relatives eventually adopted M. and another of O'Connor's children, C. The families became close and

remained close through the time of Douglas's murder. However, Douglas and Tanya did not see or communicate with O'Connor.

O'Connor failed to complete reunification services during the dependency proceedings. The dependency court terminated O'Connor's parental rights to E., and in October 2011, Tanya and Bradley finalized their adoption of him. Tanya and Bradley did not want O'Connor in E.'s life based on how she had behaved during the dependency proceedings, including an instance where she had told the dependency judge to "f**k off and die."

Between August 2011 and January 2017, Douglas and her other daughter, Lorie, lived in China. Douglas periodically mentioned to Lorie that it was important to keep their identifying information hidden from O'Connor.

In 2012, O'Connor sued Tanya and Bradley to have E. returned to her. The complaint twice alleged, in handwriting believed to be O'Connor's, that Douglas had lied during the adoption process. The lawsuit was dismissed.

Around June 2012, Tanya and Bradley purchased a home through a trust in order to make their identifying information more difficult for O'Connor to discover. They feared O'Connor because she had appeared, uninvited, to E.'s school, and Tanya thought she saw O'Connor at a park near where they lived before purchasing the home.

In the summer of 2018, O'Connor's relatives, who were involved in dependency proceedings relating to some of O'Connor's other children, came to Los Angeles.[2] They stayed at

---

[2] O'Connor had five children removed from her custody. The dependency court placed E. with Tanya and Bradley, M. and

4

Tanya and Bradley's home for part of their visit, and then stayed at Douglas's condominium.

On December 14, 2018, at approximately 4:00 p.m., O'Connor telephoned Bradley, falsely identified herself as a DCFS worker, and asked to speak to Douglas because there was paperwork related to E.'s adoption that needed Douglas's signature. Bradley did not suspect the caller was O'Connor and gave her Douglas's phone number. Because there were other ongoing dependency proceedings, Bradley believed a new DCFS worker had reviewed prior files and discovered incomplete paperwork.

At 4:02 p.m. on December 14, 2018, O'Connor left a voicemail for Douglas in which she identified herself as "Umairah Fateen of [DCFS]," and asked Douglas to return her call. Douglas received a second voicemail from "Umairah Fateen" at 4:33 p.m. The caller emphasized that Douglas needed to call her back. At trial, a DCFS human resources manager testified that neither DCFS nor Los Angeles County had employed anyone by the name of Umairah Fateen or Humara Fateen (a related name later found in O'Connor's personal journal).

Douglas returned the phone call at 4:34 p.m. and spoke for nearly three minutes with the caller. Around 4:45 p.m., Douglas spoke to Tanya on the phone, and said, approximately, "I spoke to the rudest DCFS worker, and they're saying that there is some piece of paper in [E.]'s adoption that hasn't been signed." Like Bradley, Tanya assumed the call had been legitimate. Douglas told Tanya she had offered to meet the DCFS worker at the

_____

C. with O'Connor's family, and two other children with other families.

DCFS office, but the worker had suggested they meet at Douglas's home instead. Douglas agreed, and the DCFS worker was scheduled to come to her home at 11:00 a.m. on Monday, December 17, 2018.

In December 2018, Douglas was 75 years old, wore hearing aids, suffered from carpel tunnel syndrome, could not walk long distances due to neuropathy, and lived alone in a condominium. The condominium complex was gated and locked. Douglas's front door had a peephole.

On December 16, 2018, Douglas, Lorie, and Lorie's two daughters spent the day together, beginning at approximately 10:00 a.m. They picked up a puppy for Douglas, and then returned to her condominium, where Lorie and Douglas spent part of the time sitting on the couch watching the children play with the puppy. Lorie and her children left Douglas's home at approximately 6:30 p.m. Lorie's daughter spoke with Douglas again that night at around 9:00 p.m. by video.

Starting around noon on December 17, 2018, both Tanya and Lorie attempted to contact Douglas by phone and received no response. Lorie went to Douglas's condominium building, saw that her car was in its parking spot, went to her front door, determined that it was locked, and called the police.

A Pasadena Police Department (PPD) lieutenant arrived at Douglas's condominium around 3:25 p.m., met with Lorie, and knocked on Douglas's front door without a response. He forced open the door and found Douglas's dead body on the floor in a hallway, lying face down with her face pressed into a couch cushion. Her short, gray hair was pushed away from the nape of her neck towards the top of her head. Law enforcement

6

recovered dark, long hair from Douglas's left hand. A DNA test matched those hairs to O'Connor.

Law enforcement found a Taser cartridge, wires, and prongs near Douglas's body. Taser prongs were found lodged in the door jamb, but there was no evidence of tasing on Douglas's body. Law enforcement also found anti-felon identification tags, which a Taser launches when fired. The tags are small, circular pieces of paper similar to confetti with identification numbers on them. The identification number on the tags found at the crime scene matched a Taser cartridge O'Connor purchased on February 7, 2018. The Taser company's records and O'Connor's financial records showed she purchased a Taser in July 2017 and two packages of cartridges in February 2018.

There were no signs of a struggle in the condominium, no indication anyone had ransacked it, and no indication of forced entry. Bradley told the police about the call from a DCFS worker that he had received a few days before and provided them with the call history relating to that call.

The medical examiner who conducted the autopsy observed hemorrhages in Douglas's neck and eyes, and a fracture to the neck cartilage surrounding her windpipe. There was also evidence of lack of oxygen to her brain. There was blood on Douglas's nose and the pillow that had been under her face. The medical examiner testified Douglas's injuries were consistent with Douglas being strangled for a period of time and then suffocated with a pillow against her face. Strangulation typically causes a loss of consciousness "within a minute or maybe two." However, it would take longer if there was a struggle. The medical examiner testified, "In this case, based on [the] neuropathology report, she did not die immediately. There was

[a] time period before she was asphyxiated and [the] time when she actually died . . . because neuropathology found changes in the brain consistent with anoxic brain injuries.  If you die immediately, you don't see any injuries to the brain.  If there is a time period when [the] brain is deprived of oxygen but [the] heart still beats, . . . this time period is enough to make changes inside the brain . . . .  So in this case it is not death due to strangulation.  There was a time period between strangulation and [the] victim dying."  There were also hemorrhages on Douglas's head consistent with blunt force trauma, and bruising to her hands and wrists that could have been caused by blunt force or a "soft ligature."  However, the medical examiner also testified there were no "ligature mark[s]" on Douglas's wrists.  The medical examiner found no evidence that Douglas had been tased.

On December 21, 2018, officers investigated the address to which the Taser and cartridges had been shipped, and learned the home belonged to Nowell Teitelbaum, a friend of O'Connor's.  O'Connor had lived with Teitelbaum for approximately five months in 2009, and, thereafter, he allowed her to receive mail at that address.  Teitelbaum had last seen O'Connor approximately six weeks before Douglas's death.  Teitelbaum remembered O'Connor picking up two Taser-related shipments after they arrived in the mail.

On December 26, 2018, law enforcement followed a car belonging to a different friend of O'Connor's and observed him park next to and enter an RV.  The officers found O'Connor inside the RV and arrested her.  Officers found a cellphone box with a sticky note on it.  Written on the sticky note was the phone number from which Bradley and Douglas had been called by the purported DCFS worker.  Law enforcement did not find the cell

8

phone.  Officers also found O'Connor's journals.  The journals included at least three entries, including one on December 9, 2018, referring to "Humara Futeen," phonetically the same false name O'Connor had used when posing as a DCFS worker.  One journal entry from May 2018 stated, "Use pink gloves and wear a Humara Futeen suit . . . ."  Another journal entry for December 17, 2018, described a location in Northridge where she had parked a car, and also described how to take public transportation in the direction of Santa Barbara.

On January 27, 2019, O'Connor called someone from jail and told him where she had left a car in Northridge.  During the call, she warned the man that he would find a clown costume and handcuffs inside, and urged him to not think the items suspicious, saying, "If the police are saying, 'oh, that's evidence . . . who would have that stuff?' . . .  I used to get paid to deliver singing telegrams."  Law enforcement located the car in the area O'Connor had described and identified the man O'Connor had called as the registered owner.  Inside the car, officers found a clown costume, pink handcuffs, an empty box for the Taser, another box containing Taser cartridges, and a blue beanie with a folding knife in it.  The Taser itself was never recovered.

Law enforcement found a Los Angeles County public transportation fare card in O'Connor's purse.  That card indicated, and video footage confirmed, that O'Connor boarded a bus at approximately 12:40 p.m. on December 17, 2018 in Northridge.  The video footage showed she was wearing a black, hooded sweatshirt and surgical mask over her face at a time over a year before the COVID-19 pandemic began.  O'Connor's financial records indicated she traveled to Carpinteria and stayed at a motel there for two days right after Douglas's murder.

9

## B.     The Defense Evidence at Trial

O'Connor did not testify.  The defense called two witnesses: one of the criminalists that testified during the prosecution's case and Kenneth Moses, the director of a private crime laboratory. The criminalist testified that insufficient genetic material was recovered from the pink handcuffs for a DNA comparison.  She acknowledged that DNA could be washed off an object.

Moses testified to his observations after reviewing documentation of the crime scene.  He opined that there had been a struggle but it was confined to the location of Douglas's body. There was no indication that the person with the Taser entered without permission or that there was any struggle with the victim during entry.  The couch or the couch pillows appeared to have two or three spots pushed in as though one or more persons had sat on the couch.  In one area of disruption on the couch, there was a dark object that could have been a cell phone.

During cross-examination, the prosecutor asked if, hypothetically, Moses's analysis of the crime scene was "consistent with the following scenario: that the victim in this case . . . was running towards the door; that there was someone shooting at her with a Taser from behind her or to the side of her; that she tripped or was pushed down by that person; that that person pounced on top of her before she could make it to the door and strangled her in that position, followed potentially by suffocation; and that the movement that caused the rippling in the rug is consistent with her either falling as she was being pushed or, as she was struggling for her life, kicking against the rug with her feet?"  Moses responded, "Seems very consistent with that scenario."  Moses also acknowledged that he did not know when the indentations on the couch had occurred.

## C. Jury Instructions

Defense counsel requested the court instruct the jury as to the lesser included offense of voluntary manslaughter pursuant to CALCRIM No. 570. That instruction states, in part, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [and] [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (*Ibid.*)

Defense counsel argued the instruction was warranted because the evidence supported an inference that O'Connor visited Douglas to convince her to allow O'Connor to resume a relationship with E. Counsel argued the evidence further supported an inference that Douglas knowingly let O'Connor into her home so that she could speak with O'Connor, and when Douglas refused O'Connor's request, O'Connor reacted out of emotion and launched an attack, causing Douglas's death. Counsel further argued, "there is evidence that Miss O'Connor lost child after child after child after child after child. And I think it is a very, very reasonable inference that she was very hurt by this. . . . I think it then becomes a jury determination about whether the provocation is—whether what happens is appropriate provocation . . . ."

11

The People disputed there was sufficient evidence to give the instruction, arguing, "What [defense counsel] has described is a number of inferential steps from bits and pieces of evidence that are not directly tied to any proof of specific acts of provocation. We don't know that the conversation was necessarily about [E.]. We don't know a conversation occurred at all. . . . In this case, we have no evidence at all about a provocative act on the part of [the victim]. . . . If the defense wants to argue that perhaps there was some element of provocation or rash decision that negated premeditation, that's another thing. And the court can give that provocation instruction. But I don't believe there are any inferences that one can draw here because there is no evidence of what went on inside that apartment or that there was an act of provocation that the jury can make a decision about."

Both parties then submitted briefing on whether the court should give CALCRIM No. 570. After considering those briefs, the court concluded, "I will not give the voluntary manslaughter instruction. I just don't think there is evidence to support it."

The trial court instructed the jury as to first and second degree murder with malice aforethought pursuant to CALCRIM No. 520, which included that, "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder in the first degree as defined in CALCRIM No. 521." CALCRIM No. 521, as given to the jury, provided, "The defendant is guilty of first degree murder if the People have proved that she acted willfully, deliberately, and with premeditation. The defendant acted willfully if she intended to kill. The defendant acted deliberately if she carefully weighed the considerations for and

12

against her choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if she decided to kill before completing the act that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

## D. Verdict and Sentencing

The jury found O'Connor guilty of willful, deliberate, and premeditated murder in the first degree. The court sentenced O'Connor to 25 years to life in state prison.

## DISCUSSION

## A. The Trial Court Did Not Err in Declining to Give an Instruction on Voluntary Manslaughter

### 1. *General Legal Principles and Standard of Review*

"Criminal homicide is divided into two types: murder and manslaughter." (*People v. Beltran* (2013) 56 Cal.4th 935, 941.) "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice aforethought may be express or implied. (§ 188, subd. (a).) "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as

13

willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" (*People v. Beltran*, *supra*, at p. 942.) Voluntary manslaughter "is the unlawful killing of a human being without malice," "upon a sudden quarrel or heat of passion" (§ 192, subd. (a)) and is a lesser included offense of murder (*People v. Beltran*, *supra*, at p. 942).

" '[A] trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.] ' "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." ' [Citation.] 'Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.' [Citation.] 'We review independently whether the trial court erred in rejecting an instruction on a lesser included offense.' [Citation.]" (*People v. Thomas* (2023) 14 Cal.5th 327, 385.)

2.    *Substantial Evidence Did Not Support an Instruction for Voluntary Manslaughter*

"Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. . . . [A] person who acts without reflection in

14

response to adequate provocation does not act with malice." (*People v. Beltran, supra,* 56 Cal.4th at p. 942.)

" 'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. . . . "[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." [Citation.]' [Citation.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143-1144.) " 'To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." ' [Citation.]" (*Id.* at p. 1144.)

O'Connor acknowledges there is no direct evidence of provocation at the time of the encounter between her and Douglas. O'Connor argues instead that "the accumulated history between the parties evidenced at trial was that of a turbulent tale of the taking and keeping away of a child from her mother. Such provocation of a mother through custody of her child warranted an instruction of voluntary manslaughter where, as here, the evidence of the encounter suggests a peaceful beginning between the parties and an unplanned and emotional killing."

O'Connor cites the following as evidence justifying an instruction on provocation: (1) O'Connor was homeless, mentally ill, and a prostitute who had multiple children removed from her

15

care; (2) two of her children were temporarily placed with Douglas years prior to the killing; (3) Douglas facilitated O'Connor's visits with her children during the dependency proceedings, but the visits became "contentious toward the end"; (4) O'Connor was extremely upset when the dependency court terminated her parental rights; (5) Douglas's daughter adopted [E.]; (6) Douglas and her family kept E. from O'Connor; (7) O'Connor sought to have E. returned to her and filed a civil lawsuit for that purpose; (8) a few months prior to O'Connor killing Douglas, Douglas's family and O'Connor's family had a "family reunion," but did not invite O'Connor; (9) Douglas was afraid for the children and afraid that O'Connor might take them; (10) O'Connor scheduled a meeting with Douglas using a ruse; (11) Douglas and O'Connor's interactions had been limited to O'Connor's efforts to see her children; (12) Douglas no longer had the ability to allow O'Connor to see her children and was against doing so in any event; (13) there was no sign of forced entry, the door had a peephole, and there was no evidence of a struggle at the entryway, permitting the jury to infer that Douglas recognized O'Connor and invited her in for purposes of at least a brief discussion; and (14) the crime scene indicated an attack from the sitting area toward the front door, and, along with the couch cushions that suggested recent use, permitted the jury to infer that O'Connor and Douglas had a peaceful conversation prior to the attack. O'Connor asserts the jury could reasonably infer from this evidence that she intended to meet with Douglas not to kill Douglas but to try to arrange to see E., that Douglas declined that request, which provoked O'Connor and led her to kill Douglas in the heat of passion, and that O'Conner panicked after she killed Douglas.

16

The Attorney General argues O'Connor's theory that Douglas provoked O'Connor relies on speculation and unreasonable inferences rather than substantial evidence. We agree.

Douglas's involvement in the dependency proceedings six to seven years prior to O'Connor's killing or that she met with O'Connor's family six months prior to the killing fail to constitute provocation. " ' " '[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' " ' [Citation.]" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649.) "[I]t is not sufficient that a person 'is provoked and [then] *later* kills.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 539.) Without evidence of a sudden quarrel or heat of passion, neither long-simmering resentment, a passion for revenge, nor persistent, brooding jealousy are sufficient to reduce murder to manslaughter. (See *People v. Carasi* (2008) 44 Cal.4th 1263, 1306-1307, 1308 [holding voluntary manslaughter instruction was not warranted based on the defendant's "long-simmering resentment" of former girlfriend who obtained child custody and support orders, which she was "legally entitled to do," and who maintained a relationship with the defendant's mother]; *People v. Gutierrez, supra*, 28 Cal.4th at p. 1144 ["If anything, [the] defendant appears to have acted out of a *passion for revenge*, which will not serve to reduce murder to manslaughter"]; *People v. Hudgins* (1967) 252 Cal.App.2d 174, 181 [holding the trial court properly refused to give a voluntary manslaughter instruction where the evidence demonstrated only "persistent, brooding jealousy"].)

Moreover, " ' "[t]he provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the

victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." ' [Citation.]" (*People v. Beck and Cruz*, *supra*, 8 Cal.5th at p. 649.) O'Connor was undoubtedly upset at losing her parental rights, but she could not reasonably believe that it was Douglas that caused O'Connor to lose E. or her other children. Rather, the evidence showed that O'Connor failed to comply with the dependency court's reunification plan, and, thus, the court terminated her parental rights. None of O'Connor's children lived with Douglas, Douglas was not the adoptive parent to any of those children, and Douglas alone could not grant or deny any request by O'Connor to visit with any of O'Connor's children.

Turning to what occurred on December 17, 2018, there is no evidence of what was said, much less evidence that Douglas said anything to O'Connor to provoke her. Nor is there any evidence from which the jury could reasonably infer that Douglas acted in a manner that was " ' "sufficient to arouse the passions of the ordinarily reasonable [person]" ' " (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1144) while she and O'Connor were alone in Douglas's home. O'Connor's theory is based upon only a possibility that Douglas provoked her. However, a mere possibility is not the same as a reasonable inference. (See *People v. Blinks* (1958) 158 Cal.App.2d 264, 266.) "In any given case, one 'may *speculate* about any number of scenarios that may have occurred. . . . A reasonable inference, however, "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere

18

speculation as to probabilities without evidence." ' [Citations.]"**[3]** (*People v. Cluff* (2001) 87 Cal.App.4th 991, 1002.)

Finally, even if there had been evidence that Douglas and O'Connor had a discussion in which Douglas refused to help O'Connor see E., that would still not support the giving of an instruction as it does not demonstrate provocation. O'Connor's parental rights had been terminated; she had no right to continue seeing her child. Douglas had no obligation to help O'Connor by trying to intervene with the children's adoptive parents who themselves feared O'Connor. Douglas refusing to help may have subjectively enraged O'Connor, but as a matter of law it was not " ' "sufficient to arouse the passions of the ordinarily reasonable [person]" ' " and constitute provocation for purposes of manslaughter. (*People v. Gutierrez, supra*, 28 Cal.4th at p. 1144.)

In sum, there was not substantial evidence upon which a reasonable trier of fact could find Douglas provoked O'Connor. Accordingly, the trial court did not err in declining to instruct the jury as to voluntary manslaughter.**[4]**

---

**[3]** O'Connor cites *People v. Wright* (2015) 242 Cal.App.4th 1461 as a case where "[t]he defendant testified, but not to any provocation in the moment of the encounter." O'Connor's summary of the testimony, however, excludes that the defendant's testimony from the first trial (which the trial court declared a mistrial) was played for the jury. That testimony was extensive and included the defendant's description of how she felt provoked. (See *id.* at pp. 1474-1479.)

**[4]** The parties agree that the harmless beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] would apply if the trial court erred in failing to instruct the jury as to the lesser included

**B.    Substantial Evidence Supported the Jury's Findings of Premeditation and Deliberation**

O'Connor argues there is insufficient evidence of premeditation and deliberation to support the jury's verdict of murder in the first degree.  " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  [Citation.]  In so doing, a reviewing court ' " 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' "  [Citation.]' [Citation.]"  (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

---

offense of manslaughter.  (See *People v. Schuller* (2023) 15 Cal.5th 237, 243.)  Even if we posit the trial court erred in failing to instruct the jury as to voluntary manslaughter, that error would be harmless under *Chapman*.  The court instructed the jury as to second degree murder and that if it found O'Connor guilty of murder, it must find her guilty of second degree murder unless it also found, beyond a reasonable doubt, that the murder was willful, deliberate, and premeditated.  That the jury found O'Connor guilty of willful, deliberate, and premeditated murder necessarily demonstrates that any such error was harmless beyond a reasonable doubt.  (See *People v. Peau* (2015) 236 Cal.App.4th 823, 832.)

As described above, murder that is willful, deliberate, and premeditated is murder in the first degree.  (§§ 187, subd. (a), 189, subd. (a).)  " ' " 'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' "  [Citation.]  " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' "  [Citations.]  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ."  [Citation.]' [Citation.]"  (*People v. Morales*, *supra*, 10 Cal.5th at p. 88.)

In *People v. Anderson* (1968) 70 Cal.2d 15, our Supreme Court identified three categories of evidence generally sufficient to sustain a finding of premeditation and deliberation.  (*Id.* at p. 26.)  Those categories are evidence of (1) planning activity, (2) motive, and (3) " 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take [her] victim's life in a particular way for a "reason" . . . .' [Citation.]"  (*People v. Morales*, *supra*, 10 Cal.5th at p. 89, citing *People v. Anderson*, *supra*, at pp. 26-27.)  Courts affirm "verdicts of first degree murder typically when there is evidence of all three types and otherwise require[ ] at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)."  (*People v. Anderson*, *supra*, at p. 27.)  However, " ' "[t]he *Anderson* factors, while helpful for purposes of review, are not a

21

sine qua non to finding first degree premeditated murder, nor are they exclusive." ' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1019.)

Here, the evidence of planning was strong. On the Friday before the Monday on which O'Connor killed Douglas, O'Connor made three phone calls to get access to Douglas, each time engaging in a ruse by posing as a DCFS worker to schedule a meeting with Douglas based on the pretense that paperwork concerning E.'s adoption was not in order and required Douglas's signature. When Douglas offered to meet O'Connor at DCFS's office, a public location, O'Connor suggested instead meeting at Douglas's home, where Douglas lived alone. On Monday, O'Connor kept the appointment and brought a Taser to Douglas's home, which although not lethal, could be used to incapacitate Douglas. Although she was unsuccessful in actually "tasing" Douglas, O'Connor fired that weapon while at Douglas's home. Additionally, O'Connor's planning activity extended to escaping identification and arrest after the killing: she hid her identity by wearing a mask, abandoned the car she had borrowed, and traveled by public transportation from Northridge to Carpinteria, a route she detailed in her journals.

As to motive, the jury could reasonably infer that O'Connor acted out of hatred and a desire for revenge. E. was O'Connor's first child for which the dependency court terminated her parental rights. Douglas was the first member of her family, which successfully adopted E., to become involved in the dependency proceedings. Douglas and her family also helped O'Connor's family adopt two of O'Connor's other children. Moreover, as Tanya testified, in the lawsuit against Tanya and

Bradley, O'Connor alleged that Douglas had lied during the dependency proceedings.

Finally, the manner of killing suggested a premeditated, deliberate killing. O'Connor shot a Taser at Douglas and missed. However, she did not then stop attacking Douglas. Instead, O'Connor strangled Douglas, and the evidence at trial, including O'Connor's hair in Douglas's hand, the displaced edge of the rug, and Moses's testimony indicated that Douglas tried to fight back. Thus, according to the medical examiner, O'Connor's strangulation of Douglas likely took a few minutes, and involved strangulation and then suffocation, during which time O'Connor had an opportunity to consider and recommit to killing Douglas. (See, e.g., *People v. Hovarter*, *supra*, 44 Cal.4th at p. 1020 [explaining that strangulation, "which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act," which would permit a rational trier of fact to infer a deliberate plan to kill].) Further, the jury could infer from the couch pillow under Douglas's face that O'Connor intended to silence Douglas while she attacked her or suffocate her after the strangulation was insufficient. This indicates O'Connor chose to continue attempting to kill Douglas as she would have had to walk to the couch to get the cushion before placing it under Douglas's face.

Accordingly, substantial evidence supported the jury's finding that the murder was deliberate and premeditated.

## C. Defense Counsel Was Not Ineffective in Not Requesting a Pinpoint Instruction on Provocation

Criminal defendants have a constitutional right to the effective assistance of counsel at trial and on appeal. (See *Strickland v. Washington* (1984) 466 U.S. 668, 686 [104 S.Ct.

2052, 80 L.Ed.2d 674].) To establish ineffective assistance, a defendant must demonstrate both that counsel's performance fell below an objective standard of professional reasonableness and that there is a reasonable probability that, but for counsel's failings, there would have been a more favorable outcome. (*Id*. at pp. 687-688, 694.)

O'Connor argues that defense counsel rendered ineffective assistance because he did not request the pinpoint instruction on provocation, CALCRIM No. 522. That instruction states, "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]" (*Ibid*., bracketed text in original.)

O'Connor fails to demonstrate either that defense counsel was ineffective or that she was prejudiced by his decision not to request the instruction. In requesting the instruction on the lesser included offense of voluntary manslaughter, defense counsel repeatedly argued that instruction was warranted because O'Connor had been provoked. The trial court observed that in order to give the instruction, it would have "to presume the provocation." After the benefit of two sessions of argument and the parties' briefing, the court ruled the evidence was insufficient to warrant a manslaughter instruction. Thus, the trial court would have also denied a request that it give the

pinpoint instruction on provocation.[5]  Nor would have arguing for such an instruction provided grounds for meritorious appeal given that we have determined there is no substantial evidence that would have warranted giving such an instruction.  "Counsel is not ineffective for failing to make frivolous or futile motions." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)

---

[5] O'Connor argues the prosecutor conceded the provocation instruction should be given, and that this demonstrates her counsel was ineffective.  In particular, O'Connor points to the prosecutor's statement that, "If the defense wants to argue that perhaps there was some element of provocation or rash decision that negated premeditation, that's another thing.  And the court can give that provocation instruction."  Read in context, however, it is clear the prosecutor was saying that if the defense put forth some evidence of provocation, then the provocation instruction could be given.  Immediately after making that statement, the prosecutor clarified, "But I don't believe there are any inferences that one can draw here because there is no evidence of what went on inside that apartment or that there was an act of provocation that the jury can make a decision about."

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:



ROTHSCHILD, P. J.



KLINE, J.*

---

\* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.